IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NOVUS GROUP, LLC, | : |
|       Plaintiff, | : |
| v. | :   Case No. _____ |
| PRUDENTIAL FINANCIAL INC., PRUDENTIAL INSURANCE COMPANY OF AMERICA, PRUCO LIFE INSURANCE COMPANY, PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY, PRUDENTIAL ANNUITIES, INC., PRUDENTIAL ANNUITIES LIFE ASSURANCE CORPORATION, | :   Jury Demand Endorsed Hereon |
|       Defendants. | : |

## COMPLAINT

For its Complaint against Defendants Prudential Financial Inc., Prudential Insurance Company of America, Pruco Life Insurance Company, Pruco Life Insurance Company of New Jersey, Prudential Annuities, Inc., Prudential Annuities Life Assurance Corporation, Prudential Annuities Distributors, Inc., and ABC Corporations/Entities 1-10, Plaintiff Novus Group, LLC hereby alleges as follows:

**Parties**

1. Plaintiff, Novus Group LLC ("Plaintiff" or "Novus") is an Ohio Limited Liability Company with its principal place of business in Columbus, Ohio.  Novus has two members, Eric Seyboldt and Mark McCanney, both of whom are individuals and citizens of the state of Ohio.

2. Defendant Prudential Financial Inc. ("Prudential Financial"), is a publicly-traded corporation incorporated under the laws of the state of New Jersey with its principal place of business in the state of New Jersey.

3. Defendant Prudential Insurance Company of America ("Prudential Insurance"), is a corporation incorporated under the laws of the state of New Jersey, with its principal place of business in the state of New Jersey. Prudential Insurance is a wholly owned subsidiary of Prudential Financial.

4. Defendant Pruco Life Insurance Company ("Pruco Life") is a corporation incorporated under the laws of the state of Arizona, with its principal place of business in the state of New Jersey. Pruco Life is a wholly owned subsidiary of Prudential Insurance.

5. Defendant Pruco Life Insurance Company of New Jersey ("Pruco Life NJ") is a corporation incorporated under the laws of the state of New Jersey, with its principal place of business in the state of New Jersey. Pruco Life NJ is a wholly owned subsidiary of Pruco Life.

6. Defendant Prudential Annuities, Inc., ("Prudential Annuities") is a corporation incorporated under the laws of the state of Delaware, with its principal place of business in the state of Connecticut. Prudential Annuities is a wholly owned subsidiary of Prudential Financial.

7. Defendant Prudential Annuities Life Assurance Corporation ("PALAC") is a corporation incorporated under the laws of the state of Arizona, with its principal place of business in the state of Connecticut. PALAC is a wholly owned subsidiary of Prudential Annuities.

8. Defendant Prudential Annuities Distributors, Inc. ("Prudential Distributors") is a corporation incorporated under the laws of the state of Delaware, with its principal place of business in the state of Connecticut. Prudential Distributors is a wholly owned subsidiary of Prudential Annuities.

9. Defendants ABC Corporations/Entities 1-10 are one or more corporations, businesses, or other entities that are affiliated with, owned by, and/or under the control of one or

more of Defendants Prudential Financial, Prudential Insurance, Pruco Life, Pruco Life NJ, Prudential Annuities, PALAC, and Prudential Distributors. The names and addresses of Defendants ABC Corporations/Entities 1-10 are unknown to Plaintiff at this time and could not be reasonably ascertained prior to the filing of this complaint.

10. Defendants Prudential Financial, Prudential Insurance, Pruco Life, Pruco Life NJ, Prudential Annuities, PALAC, and Prudential Distributors, and ABC Corporations/Entities 1-10 (herein after collectively "Prudential" and/or "Defendants"), collectively and/or individually issue, sell, and/or distribute a wide range of insurance, investment, management, and other financial products and services to both individual and institutional customers throughout the United States and in many other countries. Prudential's principal products and services include life insurance, annuities, retirement-related services, mutual funds, and investment management. Prudential's products and services are sold throughout the United States, including Ohio, directly and/or through local agents, dealers and/or brokers. Prudential receives substantial revenue from its products and services rendered in Ohio.

## Jurisdiction and Venue

11. Subject matter jurisdiction is proper over this action under 28 U.S.C. §1331 (federal question), § 1332 (diversity of citizenship), and §1367(a) (supplemental jurisdiction).

12. Long-arm jurisdiction is proper over this action under Ohio Revised Code Section 2307.382(A)(1), (2), (3), (4), & (6).

13. Venue is proper under 28 U.S.C. §1391(b)(1) & (2).

## Facts Common To All Counts

14. Novus was founded in 2013 to design and develop an annuity product and supporting marketing materials to sell that product. This annuity product, which later came to be

referred to as the "Transitions Beneficiary Income Rider" (hereinafter "TBIR"), was developed in response to a growing need at the intersection of two on-going economic trends.  The first is that the current generation of retirees is generally well-funded with respect to retirement income security, and these retirees are increasingly seeking ways to responsibly transfer their accumulating wealth to the next generation.  The second is that the current generation of workers is facing a retirement income deficiency due to a lack of retirement savings and decline in traditional defined-benefit retirement pension plans.  The TBIR addresses and seeks to serve the needs of both trends by providing an annuity-based wealth transfer solution that utilizes a guaranteed death benefit feature specifically designed to protect and maximize a guaranteed intergenerational legacy, regardless of market performance, whereby annuity death benefit proceeds are used to help fund retirement income for the next generation.

15.     Novus and its principals were aware that the annuity industry lacked such a product at the time.  While death benefit riders to an annuity were common in the annuity market, such death benefits were almost exclusively designed and marketed to pay to a surviving spouse.  Furthermore, some annuities optionally provided a guaranteed living withdrawal benefit (GLWB) for the annuity owner combined with a death benefit feature.  Under a GLWB rider, the annuity owner had the option to receive a guaranteed income during his or her lifetime based on a guaranteed and protected value provided by the GLWB feature.  These riders allowed for a beneficiary to receive a death benefit based only on any remaining GLWB value (or some combination thereof) still available at the death of the owner.

16.     In contrast, the TBIR contained five key features that, in combination, were wholly unique.

17. First, the TBIR would provide the owner with an annuity product that utilized a guaranteed minimum death benefit (GMDB), under which the death benefit amount was guaranteed to grow at a predetermined annual rate (commonly referred to as the annual "roll-up rate"). This GMDB mechanism itself had three key components. First, the TBIR only provided one mechanism (i.e., the annual roll-up rate) to grow the principal amount of the death benefit during the life of the owner, unlike many other death benefit riders in the marketplace that also included market-based growth features backed by a guaranteed minimum roll-up rate. Limiting the TBIR to one predictable and guaranteed insured growth feature using simple interest reduced the carrier's exposure to market-related risks and costs associated with offering and maintaining the death benefit guarantee. Second, the annual guaranteed roll-up amounts could only accrue over one owner's life-time (subject to product specifications), payable upon the death of that single life-time. By doing so, this prevented additional risk exposures and/or costs associated with the rider continuing under ownership of a successor owner (normally the surviving spouse). Third, the insured value under the GMDB could not be accessed by the owner to fund guaranteed lifetime withdrawals.

18. Second, the TBIR and related marketing materials promoted selection of a non-spouse beneficiary, typically a child or grandchild of the original owner, generally possessing a significantly longer life expectancy (and corresponding pay-out period) than a spousal beneficiary.

19. Third, the TBIR and related marketing materials specifically promoted insured death benefit proceeds to be paid to the non-spousal beneficiary in a predetermined manner through a range of life-expectancy based payout options, rather than the typical lump-sum distribution method.

20. Fourth, the TBIR was designed to be compatible for use with both qualified (*i.e.*, funded with moneys originating from a tax-deferred retirement account such as a 401K, 457 or IRA) and non-qualified annuity contracts.

21. Fifth, the TBIR's accompanying marketing materials promoted a specific contract ownership structure whereby the contract owner was a natural person, which satisfied a requirement of most insurance carriers permitting life-expectancy-based payout options to beneficiaries of non-qualified annuity contracts.

22. The TBIR's unique combination of the simple-interest guaranteed minimum death benefit (GMDB) structure that accrued over one owner's lifetime and disallowed any living benefits to the owner, combined with product-specific marketing materials promoting a life-expectancy based (*i.e.*, not a lump sum) payout to the non-spouse beneficiary created a more predictable (*i.e.*, less risky) actuarial position for the carrier, which allowed the carrier to price and market the product with higher roll-up rates. In other words, using the TBIR, the annuity owner could obtain a higher guaranteed death benefit than typically available in the then-existing competitive annuity market.

23. Novus invested substantial time, money and resources to develop the TBIR and a marketing plan to sell it.

24. Under Novus's marketing plan, the TBIR was to be marketed with a wealth transfer theme, under which an annuity owner could "protect" and "grow" a guaranteed legacy death benefit for a non-spousal beneficiary and "control" the payment of the death benefit by encouraging the owner to mandate that upon his/her death, the annuity death benefit proceeds be distributed through a life-expectancy based payout structure with the specific purpose of creating retirement income for the beneficiary.

25. In late 2013, Novus approached Genesis Financial Development Inc. ("Genesis") to validate the feasibility of the TBIR from an actuarial perspective. To that end, and before any relevant information was shared with Genesis, a nondisclosure agreement was executed between Genesis and Novus, under which Genesis agreed that all information related to the TBIR and its marketing material was to be held in the strictest confidence and that Genesis would protect it to the same extent it would protect is own confidential business information.

26. Genesis thereafter generated a detailed memorandum (the "Genesis Memo") describing the TBIR product (then called the "TER"), defining the mechanisms that would provide the insurance benefits underpinning the niche marketing initiative. A copy of the Genesis Memo is attached hereto as Exhibit A. Among other things, the Memo identified the TBIR's unique product design that utilized a guaranteed minimum death benefit (GMDB) feature to protect and maximize a guaranteed legacy value payable to a non-spouse beneficiary at the death of one natural owner. Additionally, the Memo identified that the GMDB would, at the death of the owner, be used to fund the purchase of a single premium immediate annuity (SPIA) (i.e., an insurance product that would distribute the annuity death benefit proceeds to the beneficiary in an extended and systematic manner, rather than in a lump-sum) to provide guaranteed life-time income payouts to the non-spousal beneficiary.

27. In addition to the actuarial analysis authored by Genesis, the Genesis Memo contained an appendix that included a document generated by Novus to demonstrate, by way of example, the specific marketing features and product specifications employed by the Novus Group in the construction of its unique wealth transfer product.

28. During this same development window, Novus also partnered with Annexus Group ("Annexus"), an affiliate of Genesis, for purposes of presenting the TBIR concept to

Nationwide Life Insurance Company ("Nationwide") (and/or one of its affiliated companies), headquartered in Columbus, Ohio.  Annexus had, and continues to have, an extensive business relationship with Nationwide, through which Annexus provided and continues to provide, among other things, assistance to Nationwide in the development and ultimate distribution of annuity products, including potentially new annuity products in which Nationwide might have interest.

29. To that end, Annexus and Novus entered into a "Marketing & Training Agreement" (the "Annexus Agreement") in February 2014.  Pursuant to the Annexus Agreement, Annexus agreed to present the TBIR concept and supporting marketing materials to Nationwide and other potentially interested carriers, and Annexus would use its best efforts to secure an agreement with Nationwide to issue the TBIR as part of the Nationwide's portfolio of annuity products.  Under the Annexus Agreement, Novus would receive payments based on the dollar value of sales and annual account values of annuities containing the TBIR.

30. Critically, the Annexus Agreement contained strict confidentiality requirements, under which Annexus was required to use and maintain all information concerning the TBIR and its accompanying marketing plans "in the strictest confidence."

31. Annexus presented the TBIR concept and marketing information, including a copy of the Genesis Memo, to Nationwide in June 2014.

32. In July, 2014, Novus, in conjunction with Annexus and as part of their joint effort to present the TBIR concept and related marketing materials to Nationwide, provided additional materials concerning the TBIR to Nationwide's product development team, including but not limited to Nathan Wilbanks (then Vice-President and Actuary), Charles Bremer (Actuary), and Michael Morrone, Vice President – Business Development of Annuity Products.  These materials

included a TBIR "FAQ" document (copy attached hereto as Ex. B), and TBIR "Feasibility Study" (copy attached hereto as Ex. C).

33. At that time, Annexus and Nationwide were themselves parties to a mutual confidentiality and non-disclosure agreement (the "Annexus/Nationwide NDA") which required that Nationwide hold "confidential information" it obtained from Annexus in the strictest confidence, exercise no less care with respect to such confidential information than it would with respect to its own confidential information, and would not copy or disclose to any third party such confidential information.  In addition, the Annexus/Nationwide NDA required that Nationwide ensure that its directors, officers, employees, and agents comply with the requirements of the Annexus/Nationwide NDA and were themselves subject to confidentiality and non-use agreements that contained terms and provisions comparable to those contained in the Annexus/Nationwide NDA.

34. All the information concerning the TBIR concept and its related marketing materials provided by Annexus and Novus to Nationwide (collectively, the "TBIR Information") constituted "confidential information" pursuant to the Annexus/Nationwide NDA.

35. At the time that Annexus presented the TBIR Information to Nationwide, Rodney Branch was Nationwide's Vice President of Annuity Products, Innovation and Business Leader. In that role, Branch evaluated all new annuity-related product concepts presented to Nationwide. Additionally, Lisa Ferris was Product Director in the annuity product group at Nationwide.

36. Upon information and belief, the TBIR Information was shared with Branch and/or Ferris in their positions as employees and agents of Nationwide and within the course and scope of their employment with Nationwide.  Branch and/or Ferris reviewed that TBIR Information and had the information in their possession while employed by Nationwide.

9

37. Ultimately, Nationwide chose not to pursue the TBIR concept as part of its portfolio of annuity products.

38. In June, 2015, Branch left Nationwide to take a position with Prudential Annuities as its Chief Marketing Officer, located in Shelton, Connecticut. In March 2016, Branch was promoted to Prudential Annuities' "Head of Product and Chief Marketing Officer" where one of his job responsibilities included leading the development and product pricing process.

39. In June 2016, Ferris also left Nationwide and joined Branch at Prudential Annuities, as the Director of Product Marketing and Strategic Initiatives and Integration.

40. At the same time that Branch was hired by Prudential Annuities, Prudential was seeking to diversify their variable annuity products and in particular, to reduce its retained exposure to equity-market fluctuations that existed in its GLWB annuity contracts. In other words, Prudential was seeking to shift current and future clients into products that would reduce Prudential's obligations to pay a living benefit to the annuity contract owner, for example, a product that had the features of the TBIR.

41. Consistent with that goal, beginning in May 2017, and continuing to this day, Prudential has marketed and sold an optional death benefit rider to its Premier Retirement Variable Annuity under the name of "Legacy Protection Plus."[1]

42. While the name may be different, Prudential's Legacy Protection Plus optional death benefit rider is identical to the TBIR and its marketing materials developed by Novus. Like the TBIR, the Legacy Protection Plus annuity rider:

    a. provides the owner with a single-growth mechanism GMDB guaranteed to grow at a predetermined annual simple-interest roll-up rate, to accrue over one owner's

---

[1] See generally, https://www.prudential.com/personal/annuities/products/legacy-protection-plus.

10

life-time payable upon the death of that owner, which cannot be accessed by the owner to fund guaranteed lifetime withdrawals;

b. allows, and is marketed and promoted to allow, the selection of a non-spouse beneficiary, typically a child or grandchild, of the original owner;

c. allows, and is marketed and promoted to allow, the contract owner to mandate that the insured death benefit will be paid to the non-spouse beneficiary in a predetermined manner through a range of life-expectancy based payout options rather than the typical lump-sum method;

d. is compatible for use with both qualified and non-qualified annuity contracts;

e. is promoted to serve a contract owner who is a natural person; and

f. is marketed with a wealth transfer theme, under which an annuity owner could "protect" and "grow" a guaranteed legacy death benefit and "control" the payment of the death benefit by encouraging the owner to mandate that the annuity death benefit proceeds be distributed through a life-expectancy based payout structure with the specific purpose of creating retirement income for the next generation.

43. Upon information and belief, Prudential used, copied, infringed on, misappropriated, and/or converted the TBIR Information that Branch and Ferris obtained during their employment with Nationwide and ultimately took with them to Prudential, all in violation of the Annexus/Nationwide NDA, and upon information and belief, Branch and Ferris' own confidentiality agreements with Nationwide.

44. Upon information and belief, Prudential used, copied, infringed on, misappropriated, and/or converted the TBIR Information to develop, issue, market, and sell the Legacy Protection Plus optional death benefit rider for its own use.

45. Since their employment by Prudential, Branch and Ferris have acted at all times relevant hereto within the course and scope of their employment, and therefore Prudential is vicariously liable for their conduct under respondeat superior, agency, and/or agency by estoppel doctrines.

46. Prudential has marketed and sold, and continues to market and sell, the Legacy Protection Plus optional death benefit rider, including in Ohio and to Ohioans, and Prudential has received and continues to receive substantial revenue and profits therefrom, including substantial revenue and profits from the sale of the Legacy Protection Plus optional death benefit rider in Ohio and to Ohioans.

**COUNT I – MISAPPROPRIATION OF TRADE SECRETS**
**[Uniform Trade Secrets Act, as adopted by**
**Ohio (Ohio R.C. §§ 133.61 et seq.),**
**New Jersey (N.J.S.A. 56:15-1 et seq.), and**
**Connecticut (Conn. Gen. Stat. §§ 35-50 et seq.)]**

47. Plaintiff repeats and realleges the proceeding allegations as if set forth herein.

48. The TBIR Information was originally developed, created, drafted, and/or authored in whole or in part by Novus, and it was and remains the property of Novus.

49. Novus expended substantial effort and expense in developing, creating, drafting, and authoring the TBIR Information.  Novus has a legitimate business interest in keeping such proprietary information protected from disclosure and/or use by third-parties.  The TBIR Information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons.

50. The TBIR Information was maintained and kept confidential by Novus and was subject to efforts that were reasonable under the circumstances to maintain its secrecy. The TBIR Information was shared with Genesis, Annexus, and ultimately Nationwide, including its agents and employees Branch and Ferris, under contractual obligations that those entities and persons keep that information confidential, and not be used or shared by third-parties without the approval and consent of Novus.

51. The TBIR Information constitutes Novus' confidential and proprietary trade secrets.

52. Defendants have willfully and maliciously misappropriated Novus's trade secrets by: (1) acquiring it through improper means or knowing or having reason to know that it was acquired by improper means; and/or (2) disclosing and/or using it without the express or implied consent of Novus knowing or having reason to know that it (a) was derived from or through a person who had utilized improper means to acquire it, (b) was acquired under circumstances giving rise to a duty to maintain its secrecy or limits use, or (c) was derived from or through a person who owed a duty to Novus to maintain its secrecy or limit its use.

53. Novus has been damaged by Defendants' willful and malicious misappropriation of trade secrets in an amount to be determined at trial that exceeds $75,000.00 exclusive of interest and costs.

54. Pursuant to the Uniform Trade Secrets Act, as adopted by Ohio (Ohio Rev. Code §§ 1333.61 et seq.), New Jersey (N.J.S.A. 56:15-1 et seq.), and Connecticut (Conn. Gen. Stat. §§ 35-50 et seq.), Plaintiff is entitled to (1) permanent injunctive relief precluding Defendants from using Plaintiff's trade secrets; or in the alternative, (2) exceptional injunctive relief that conditions future use of the trade secrets by Defendants, or any subsequent related entities, upon

payment of a reasonable royalty; (3) actual damages caused by the misappropriation; (4) unjust enrichment damages caused by the misappropriation that is not taken into account in computing actual loss; (5) past and future reasonable royalty payments; (6) punitive damages; and (7) attorneys' fees.

## COUNT II – COPYRIGHT INFRINGEMENT

55. Plaintiff repeats and incorporates by reference the preceding paragraphs as if fully restated herein.

56. The TBIR Information, and in particular the TBIR marketing materials, contains Novus's original protected expression and its copyrighted materials.

57. Through its use of the TBIR Information in Prudential's creation, development, issuance, marketing, and sale of the Legacy Protection Plus death benefit rider, Defendants have infringed and continue to infringe on Novus's copyrighted materials.

58. Defendants actions constituted and constitute an on-going and willful unauthorized infringement of Novus's copyrighted work in violation of 17 U.S.C. §106.

59. Pursuant to 17 U.S.C. §§ 502 & 504, Novus is entitled to (1) an injunction preventing Defendants on-going copyright infringement, and (2) damages in an amount to be proven at trial plus disgorgement of the profits Defendants have obtained through the sale of the Legacy Protection Plus death benefit rider, or alternatively, statutory damages.

## COUNT III -- UNJUST ENRICHMENT

60. Plaintiff repeats and incorporates by reference the preceding paragraphs as if fully restated herein.

61. Plaintiff Novus conferred a benefit on Defendants through access to the TBIR Information that it obtained through its agents and employees Branch and Ferris.

62. Defendants were aware of the benefit conferred.

63. Defendants have been enriched by the use of the TBIR Information, which Defendants are using in their business and are receiving compensation for through the sales of its Legacy Protection Plus optional death benefit rider.

64. It would be unfair and inequitable for Defendants to retain the benefits conferred without paying Novus reasonable and just compensation therefor.

65. As a result of Defendants' unjust enrichment, Novus is entitled to damages in an amount to be determined at trial, to exceed $75,000.00 exclusive of interest and costs.

### **COUNT IV – CONVERSION**

66. Plaintiff repeats and incorporates by reference the preceding paragraphs as if fully restated herein.

67. Plaintiff Novus is the rightful owner of the TBIR Information, with the exclusive right to wholly possess such property and exclude others from possessing such property.

68. Defendants have wrongfully and against the will of Novus exercised possession, control, use, and ownership of the TBIR Information in a matter that is inconsistent with Novus's rights of ownership and possession of the TBIR Information.

69. As a result, Defendants have wrongfully and unlawfully converted the TBIR Information.

70. As a result of Defendants' conversion, Novus is entitled to damages in an amount to be determined at trial, to exceed $75,000.00 exclusive of interest and costs.

**WHEREFORE**, Plaintiff Novus respectfully demands a trial by jury and prays for judgment as follows:

A. A permanent injunction enjoining Defendants from using Novus's trade secrets, copyrights, and proprietary information;

B. Actual damages and unjust enrichment damages;

C. Past and future royalties;

D. Disgorgement of Defendants' profits;

E. Punitive or exemplary damages;

F. Pre-judgment and post-judgment interest to Plaintiff;

G. Attorneys' fees, costs, and expenses to Plaintiff; and

H. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ James E. Arnold*
James E. Arnold (OH 0037712), *Trial Attorney*
Gerhardt A. Gosnell II (OH 0064919)
JAMES E. ARNOLD & ASSOCIATES, LPA
115 W. Main St., Fourth Floor
Columbus, Ohio  43215
Telephone:     (614) 460-1600
Email:          jarnold@arnlaw.com
                ggosnell@arnlaw.com

***Counsel for Plaintiff Novus Group LLC***

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

*/s/ James E. Arnold*