# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**NOVUS GROUP, LLC,**

      **Plaintiff,**

                                **Case No. 2:19-cv-208**

      **vs.**                              **Judge Edmund A. Sargus, Jr.**

                                **Magistrate Judge Elizabeth P. Deavers**

**PRUDENTIAL FINANCIAL INC.,** *et al.,*

      **Defendants.**

## OPINION AND ORDER

This matter involves a trade secret misappropriation claim under the Ohio Uniform Trade Secret Act, Ohio Revised Code §§ 1333.61 to 1333.69 (the "OUTSA").[1] Currently before the Court for consideration is Plaintiff Novus Group, LLC's Motion to Compel Production of Documents from Defendants.  ("Novus") (ECF Nos. 79, 80.)  Defendants Prudential Financial Inc., Prudential Insurance Company of America, Pruco Life Insurance Company, Pruco Life Insurance Company of New Jersey, Prudential Annuities, Inc., Prudential Annuities Life Assurance Corporation, Prudential Annuities Distributors, Inc. (collectively "Prudential" or "Defendants") have filed a response (ECF Nos. 83, 84) and Novus has filed a reply.  (ECF No. 85).[2]  For the following reasons, the Motion to Compel is **DENIED.**

---

[1] Plaintiff's conditional claims for unjust enrichment and conversion arising under New Jersey law were dismissed on September 17, 2019.  Opinion and Order, (ECF No. 34); *see also Novus Grp., LLC v. Prudential Fin., Inc.,* No. 2:19-CV-208, 2019 WL 4452708 (S.D. Ohio Sept. 17, 2019).

[2] The motion to compel and Prudential's response were filed under seal (ECF Nos. 79, 83) with redacted versions filed on the public record (ECF Nos. 80, 84).

# I.

For purposes of context, in his Opinion and Order dated September 17, 2019, granting, in part, and denying, in part, Prudential's motion to dismiss, Judge Sargus explained the nature of both the alleged trade secret and the alleged misappropriation as follows:

## A. The Alleged Trade Secret

In 2013, two men who collectively shared over 30 years of experience in the annuity industry founded Novus specifically to design and develop an innovative annuity product. Novus named that product the Transitions Beneficiary Income Rider (the "TBIR"), which it created in response to the market's growing desire for retirees to responsibly transfer their accumulated wealth to fund the following generation's retirement income. Novus recognized that retirees' income security was generally well-funded but that the working population faced a retirement income deficiency due to a lack of retirement savings and the decline of traditional benefit retirement pension programs. As a solution to this problem, Novus created the TBIR.

Novus asserts that the TBIR combined five features to create a wholly unique annuity product. First, the TBIR utilized a guaranteed minimum death benefit ("GMDB"), which set the death benefit amount at a predetermined annual rate (the "roll-up rate"). Novus claims the GMDB's structure was unique for several reasons. For one, it used simple interest, which is more predictable than often-utilized market growth and therefore reduces exposure to risk and management costs. The TBIR's GMDB also used a roll-up rate that could only accrue over a single owner's lifetime, as opposed to multiple owners' lifetimes (*e.g.*, continuing to accrue through the surviving spouse). This shorter accrual period further reduced risk and maintenance costs. Additionally, the TBIR structured the GMDB to prohibit owners from making lifetime withdrawals against the TBIR's insured value, thereby ensuring financial predictability and reducing risk.

Novus asserts that the TBIR's second unique feature was its beneficiary structure. Novus designed the TBIR specifically for non-spousal beneficiaries, such as the owner's child or grandchild. Since the owner's children and grandchildren would presumably survive the owner's spouse, the TBIR's beneficiaries had life expectancies and corresponding payout periods that were significantly longer than annuities with spousal beneficiaries. With longer payout periods and therefore smaller payments, the TBIR provided significant tax advantages.

Third, Novus designed the TBIR to deposit beneficiaries' death benefit proceeds in monthly installments, which were calculated using the beneficiaries' life expectancies. This payment structure was unique because annuities often distribute insured death benefit proceeds as a lumpsum. Again, the smaller monthly payments minimized taxes.

Fourth, Novus avers that it designed the TBIR for compatibility with qualified and non-qualified annuity contracts. Qualified annuity contracts are those funded with money originating from a tax-deferred retirement account. Non-qualified annuity contracts are funded by after-tax dollars. According to Novus, this flexibility was unique and valuable.

Fifth, Novus designed and promoted the TBIR as a product that only natural persons could purchase. This ownership structure satisfied a common requirement by most insurance carriers in order to permit life-expectancy-based payout options to the beneficiaries of non-qualified annuity contracts. By broadening the TBIR's compatibility with various annuity contracts, Novus expanded its potential market.

In sum, Novus asserts that the TBIR's unique combination of the simple-interest GMDB that accrues over one owner's lifetime and bars any living benefits to the owner, combined with product-specific marketing materials promoting a life-expectancy-based payout to the non-spouse beneficiary, created a more predictable, less risky actuarial position for the carrier. As a result, Novus claims, the carrier could price and market the TBIR with higher roll-up rates. In other words, the TBIR could obtain a guaranteed death benefit that was higher "than typically available in the then-existing competitive annuity market." *Id.* at ¶ 22.

Novus also developed the TBIR's marketing materials (collectively with the TBIR, the "TBIR Information"). Novus's two members expended hundreds of hours of work and thousands of dollars developing the TBIR Information. They planned to sell or assign the TBIR Information to insurance carriers, which would then offer the TBIR as a product within their portfolios.

### B. The Alleged Misappropriation

After developing the TBIR Information, Novus approached Genesis Financial Development, Inc. ("Genesis") in 2013 to assess the TBIR's actuarial soundness in late 2013. After Novus and Genesis executed a nondisclosure agreement, Genesis analyzed the TBIR and wrote a confidential memorandum that described the TBIR[1] (the "Genesis Memo"). According to Novus, the Genesis Memo identified insurance benefits that the TBIR would offer to the annuity market.

Around this time, Novus also partnered with Annexus Group ("Annexus"), which had previously assisted Nationwide Life Insurance Company ("Nationwide") with developing and distributing annuity products. Novus avers that Annexus and Nationwide were parties to a mutual confidentiality and nondisclosure agreement (the "Annexus/Nationwide NDA"). Novus asserts that the TBIR Information constituted "confidential information" under the Annexus/Nationwide NDA. Novus hired Annexus to present the TBIR Information to Nationwide. To that end, in February 2014, Novus and Annexus executed a Marketing & Training Agreement (the "Annexus Agreement"), which "contained strict confidentiality

requirements." Pl.'s Am. Compl. at ¶ 31. Under the Annexus Agreement, Annexus would present the TBIR Information to Nationwide and other carriers with the goal of those carriers offering the TBIR in their annuity portfolios. If that happened, Novus would receive payments based on the dollar value of sales and annual account values of the annuities that used the TBIR.

In June 2014, Annexus presented the TBIR Information to Nationwide, including Nationwide's Vice President of Business Development of Annuity Products, Michael Morrone ("Morrone"). In that role, Morrone reported directly to Rodney Branch ("Branch") and supervised Lisa Ferris ("Ferris"). At the time, Branch was Nationwide's Vice President of Annuity Products, Innovation and Business Leader, and Ferris was Product Director of Nationwide's Annuity Product Group. According to Novus, "Branch and Ferris were privy to and part of the Nationwide team to evaluate all new annuity-related product concepts presented to Nationwide, including from Annexus." *Id.* at ¶ 36. Based on this, Novus alleges that, "[u]pon information and belief, the TBIR Information was shared with Branch and/or Ferris in their positions as employees and agents of Nationwide and within the course and scope of their employment with Nationwide." Pl.'s Am. Compl. at ¶ 37. Novus also asserts that "Branch and/or Ferris reviewed the TBIR Information and had the information in their possession while employed by Nationwide." *Id.* Nationwide ultimately chose not to issue the TBIR as a part of its annuity product portfolio.

In June 2015, Branch left Nationwide and joined Prudential Annuities as its Chief Marketing Officer. According to Novus, at that time "Prudential was seeking to shift current and future clients into products that would reduce Prudential's obligations to pay a living benefit to the annuity contract owner...." *Id.* at ¶ 41. In March 2016, Prudential promoted Branch to Head of Product and Chief Marketing Officer. In that role, Branch led the development and product pricing for Prudential's new annuity products. In June 2016, Ferris left Nationwide and joined Prudential Annuities as Director of Product Marketing and Strategic Initiatives and Integration. *Id.* at ¶ 40.

Novus asserts that—consistent with Prudential's goals, the job responsibilities of Branch and Ferris, and their knowledge of the TBIR Information—Prudential misappropriated Novus's TBIR Information in May 2017, when Prudential began marketing and selling an optional death benefit rider to a retirement annuity. *Id.* at ¶ 42. Prudential named this product the "Legacy Protection Plus." Novus claims that "[w]hile the name may be different, Prudential's Legacy Protection Plus optional death benefit rider is identical to the TBIR and its marketing materials developed by Novus." *Id.* at ¶ 43. According to Novus, like the TBIR, the Legacy Protection Plus:

• provides the owner with a single-growth mechanism GMDB guaranteed to grow at a predetermined annual simple-interest roll-up rate, to accrue over one owner's lifetime payable upon death of that owner, which cannot be accessed by the owner to fund guaranteed lifetime withdrawals;

• allows, and is marketed and promoted to allow, the selection of a non-spouse beneficiary, typically a child or grandchild, of the original owner;

• allows, and is marketed and promoted to allow, the contract owner to mandate that the insured death benefit will be paid to the non-spouse beneficiary in a predetermined manner through a range of life-expectancy based payout options rather than the typical lump-sum method;

• is compatible for use with both qualified and non-qualified annuity contracts;

• is promoted to serve a contract owner who is a natural person; and

• is marketed with a wealth transfer theme, under which an annuity owner could "protect" and "grow" a guaranteed legacy death benefit and "control" the payment of the death benefit by encouraging the owner to mandate that the annuity death benefit proceeds be distributed through a life-expectancy based payout structure with the specific purpose of creating retirement income for the next generation.

*Id.* at ¶ 43.

Novus claims that Branch and Ferris obtained the TBIR Information while working at Nationwide and then shared it with Prudential, in violation of the Annexus/Nationwide NDA and their own confidentiality agreements with Nationwide. Further, Novus alleges that Prudential is vicariously liable for the actions of Branch and Ferris.

*Novus Grp., LLC v. Prudential Fin., Inc.,* No. 2:19-CV-208, 2019 WL 4452708, at *1–4 (S.D. Ohio Sept. 17, 2019); *see also* ECF No. 34 at 1-6.

By way of brief procedural background, after this case had been pending for nearly two and a half years, Novus obtained new counsel in June 2021. (ECF No. 55.) Shortly thereafter, the case management schedule was amended to accommodate that new counsel. (ECF No. 64.) The amended schedule set a discovery deadline of September 30, 2021; an expert discovery deadline of December 8, 2021; and a dispositive motion deadline of December 23, 2021. (*Id.*)

On September 24, 2021, Novus conducted the deposition of Prudential's Chief Actuary Todd Bryden ("Bryden.") On November 16, 2021, Novus conducted the Rule 30(b)(6) deposition of Prudential's corporate representative Matt Silver ("Silver.") Based on the

deposition testimony offered by both witnesses, Novus came to believe that Prudential possesses additional documentation relevant to the claims and defenses in this case that has not been produced.  Informal attempts to resolve the issues were unsuccessful.  Accordingly, Novus seeks an order compelling Prudential to produce the following categories of documents:

- Quarterly and Annual Reserve Packages used by the valuations team currently led by Mr. Silver;

- Expense and unit cost information associated with the LPP product;

- Profitability dashboards (generated in PDF form) for the LPP product;

- LPP policy data from Prudential's VPAS system for the LPP for the years ending 2017, 2018, and 2019; and

- Codes to understand the different commission options available to LPP salespeople.[3]

(ECF No. 80 at 3.)   Novus argues that this discrete and reasonable set of discovery will not burden Prudential because the documents either already exist or easily can be generated from Prudential's VPAS system.  Novus asserts that, without this information, "it is unable to evaluate the full financial picture associated with the LPP product, evaluate the actuarial and accounting benefits that the LPP provided to Prudential or cross examine Prudential's witnesses regarding any assertion Prudential attempts to make at trial regarding the financial benefits (or lack thereof) of the LPP product."  (ECF No. 80 at 9.)

To the contrary, Prudential contends initially that it has satisfied Novus's requests for production and that the documents sought here are outside these requests.  Further, Prudential argues that Novus mischaracterizes Mr. Bryden's testimony to the extent it relies on it as a basis

---

[3] Novus's motion indicates a tentative agreement between the parties as to this category.

for the motion to compel. Finally, Prudential argues that the information Novus seeks is irrelevant, already has been produced or does not exist.

## II.

Federal Rule of Civil Procedure 37 permits a party to file a motion for an order compelling discovery if another party fails to respond to discovery requests, provided that the motion to compel includes "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). Consistent with this, Local Rule 37.1 requires the parts to "exhaust[] among themselves all extrajudicial means for resolving their differences" before filing an objection, motion, application, or request relating to discovery. S.D. Ohio Civ. R. 37.1. Local Rule 37.1 also allows parties to first seek an informal telephone conference with the Judge assigned to supervise discovery in the case, in lieu of immediately filing a discovery motion. *Id.* The Court is satisfied that the parties have exhausted all extrajudicial means to resolve this dispute.

"District courts have broad discretion over docket control and the discovery process." *Pittman v. Experian Info. Sol., Inc*., 901 F.3d 619, 642 (6th Cir. 2018) (citation omitted). "'It is well established that the scope of discovery is within the sound discretion of the trial court.'" *Id*. (quoting *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993)). The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). While a plaintiff should "not be denied access to information necessary to establish her claim," a plaintiff may not be "permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *In re Ohio*

7

*Execution Protocol Litigation*, 845 F.3d 231, 236 (6th Cir. 2016) (citation omitted); *see also Gallagher v. Anthony*, No. 16-cv-00284, 2016 WL 2997599, at *1 (N.D. Ohio May 24, 2016) ("[D]istrict courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce.").

Determining the scope of discovery is within the Court's discretion. *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998). "The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant." *Gruenbaum v. Werner Enter., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citation omitted). If the movant makes this showing, "then the burden shifts to the non-movant to show that to produce the information would be unduly burdensome." *Prado v. Thomas*, No. 3:16-CV-306, 2017 WL 5151377, at *1 (S.D. Ohio Oct. 19, 2017) (citing *O'Malley v. NaphCare, Inc*., 311 F.R.D. 461, 463 (S.D. Ohio 2015)); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (stating that a party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination" and that a "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them").

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1); *see also Siriano v. Goodman Mfg. Co., L.P.*, No. 2:14-CV-1131, 2015 WL 8259548, at *5 (S.D. Ohio Dec. 9, 2015). "*Relevance* is construed very broadly for discovery purposes." *Doe v. Ohio State Univ.*, No. 2:16-CV-171, 2018 WL 1373868, at *2 (S.D. Ohio Mar. 19, 2018) (emphasis in original) (citation omitted). Despite being construed broadly, the concept of relevance is not unlimited. *Averett v. Honda of Am. Mfg., Inc.*, No. 2:07-cv-1167, 2009 WL

799638, at *2 (S.D. Ohio March 24, 2009). Indeed, "[t]o satisfy the discoverability standard, the information sought must have more than minimal relevance to the claims or defenses." *Doe*, 2018 WL 1373868 at *2 (citations omitted). Furthermore, when information is "negligibly relevant [or] minimally important in resolving the issues" this will not satisfy the standard. *Id.* (citation omitted).

"[T]he Federal Rules of Civil Procedure instruct district courts to limit discovery where its 'burden or expense . . . outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (quoting former Fed. R. Civ. P. 26(b)(2)(C)(iii)). This Court has previously held that "[t]hese factors are retained in revised Fed. R. Civ. P. 26(b)(1), reflecting 'their original place in defining the scope of discovery'" because "'[r]estoring proportionality' is the touchstone of revised Rule 26(b)(1)'s scope of discovery provisions." *Siriano*, 2015 WL 8259548, at *5 (citing Fed. R. Civ. P. 26(b)(1)). In analyzing the extent of the burden on the producing party, the Court of Appeals for the Sixth Circuit "has held that limiting the scope of discovery is appropriate when compliance 'would prove *unduly* burdensome,' not merely expensive or time-consuming." *Id.* (citing *Surles*, 474 F.3d at 305) (emphasis in original).

### III.

Initially, the Court finds no merit to Prudential's various claims that the current motion to compel is procedurally improper and will not discuss the matter further. Similarly, it will not consider Prudential's request for sanctions. Instead, the Court addresses the merits of the motion as follows.

### A.  LPP Policy Data from Prudential's VPAS System for the Years Ending 2017, 2018, and 2019

Novus contends that this information is relevant "because it will allow Novus to assess how the product reserves changed over time as well as how the LPP product was valued by Prudential over time." (ECF No. 80 at 13.)  Novus cites particular testimony from Mr. Silver as confirmation that this information exists.  Prudential explains that it has produced LPP reserve data for Q4 2020 and two dates in 2021 and that earlier data is not available as confirmed by certain other testimony from Mr. Silver.  (ECF No. 84 at 25.)

The representation from Prudential's counsel that no such pre-December 2020 reserve information for LPP exists is a sufficient basis on which to deny Novus's motion to compel. "Ordinarily, the representation of a party's attorney that no additional documents exist is sufficient to defeat a motion to compel absent credible evidence that the representation is inaccurate." *Brown v. Tellermate Holdings Ltd.,* No. 2:11-CV-1122, 2013 WL 1363738, at *6 (S.D. Ohio Apr. 3, 2013).  Accordingly, if Novus does "'not provide any evidence demonstrating that responsive documents do, in fact, exist and are being unlawfully withheld, [its] motion to compel must fail.'" *Id*. (quoting *Alexander v. F.B.I.,* 194 F.R.D. 299, 301 (D.D.C.2000)).  Novus has not done so.  Novus's reliance on certain testimony from Mr. Silver on this point is unpersuasive.  As Prudential notes, the focus of this cited testimony is "number of policies" in force at a given time not the availability of reserve date for those policies.   Novus's representation through counsel, that it has produced all responsive documents on this subject, "is sufficient without the need for further attestation by corporate representatives." *Id*. (citing *Cardenas v. Dorel Juvenile Group, Inc. .,* 230 F.R.D. 611, 620 (D.Kan.2005)).   Moreover, "trial counsel themselves have an affirmative obligation to insure that what their clients tell them is accurate, *see Bratka v. Anheuser–Busch Co., Inc.,* 164 F.R.D. 448 (S.D.Ohio 1995), and the

Court presumes that they have discharged their duties in this case accordingly." *Id.* For these reasons, Novus's motion to compel is **DENIED** as to LPP Policy Data from Prudential's VPAS system for the years ending 2017, 2018, and 2019.

### B.  The Three Remaining Discovery Requests

Novus requests documents relating to quarterly and annual reserve packages, expense and unit cost information for the LPP product, and profitability data for the LPP product.

With respect to the reserve packages, Novus explains that

> [t]hese reports will further allow experts to assess and evaluate the overall picture of Prudential's LPP annuities business in context alongside Prudential's other variable annuities business. They will also allow experts to further assess the overall financial performance of the LPP as well as the collateral benefits that sales and internal transfers of the LPP afforded Prudential from both an actuarial and accounting standpoint.

(ECF No. 80 at 10.)

With respect to expense and unit cost information, Novus states that

> expenses attributable to the LPP product are unquestionably relevant to the claims in this case and because they are already tracked and used in the ordinary course of business any burden to collect and produce this information is minimal. By contrast, Novus will be prejudiced if it is not able to discovery [*sic*] and examine actual expense data from Prudential. The Court should accordingly order Prudential to produce its records reflecting expenses for its variable annuities business as a whole and also any expenses it has identified as specifically attributable to the LPP.

(*Id*. at 11.)

With respect to profitability dashboards, Novus asserts that

> These dashboard packages are relevant to the issues in this case because [they] provide Novus access to a point of reference used by Prudential in the ordinary course of its business to assess profitability of the LPP. They are also relevant because they ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ thus showing the value of a unique product like LPP.

(*Id.* at 12**.)**

11

Prudential objects to all of these requests.  With respect to the reserve data, Prudential

asserts that it has produced reserve data for LPP (PRU088024) – the sole Prudential product at

issue.  (ECF No. 84 at 15.)   Prudential also contends that discovery into reserves is inappropriate

because Genesis, not Novus, performed the actuarial analysis (the amount of reserves a carrier

would maintain for TBIR) and owns that analysis and that this "is not even alleged to be Novus's

trade secret."  (*Id.*)[4]  As for LPP expense and unit cost data, Prudential states that it has produced

LPP-specific payments and liabilities information to the extent it exists, including extensive

documentation of commissions paid as a result of LPP sales (PRU088020-22); reserves

maintained to cover LPP-related liabilities; and documents on LPP's profitability.  (*Id*. at 17.)

Specifically with respect to profitability, Prudential explains that PRU088024 documents LPP's

profitability and also that it provided information relating to annuities predating any alleged

disclosure of Novus's trade secret through both documents and Mr. Silver's testimony.  Beyond

this, Prudential contends that discovery into its annuity business as a whole is not warranted.

Novus prefaces its argument in Reply by contending that Prudential is attempting "to

redefine this case with an improperly narrow definition of the alleged trade secret and the accused

LPP product, and then define relevance based on those concocted definitions."  (ECF No. 85 at 2.)

In Novus's view, the accused product is broader than Prudential contends.  (*Id.*)   Specifically,

---

[4] With respect to the trade secret at issue, in Prudential's view, Novus contends that it developed
an "annuity financial product."  (ECF No. 84 at 6.)  "Novus does not contend that it developed
an annuity. Nor could it." (*Id.* at 7.) "As Novus made plain in its Amended Complaint, another
company—Genesis—performed the actuarial work and developed the annuity underlying
Novus's alleged trade secret.  Novus contends that it developed a rider ("TBIR") and marketing
idea".  (*Id.*)  Elsewhere in its Response, Prudential explains "As an initial matter, Novus's
alleged trade secret is a marketing idea, not an annuity product, and Genesis undisputedly
conducted the actuarial analysis and owns the intellectual property associated with that analysis.
So "actuarial benefits" have little relevance to this case." (*Id.* at 14.)  With respect to the accused
product, Prudential explains: "This case is about Legacy Protection Plus ("LPP")—an optional
rider to annuities that was sold by Prudential on a limited basis for about three and a half years—
not about Prudential's annuity business as a whole."  (*Id.* at 6.)

Novus takes issue with Prudential's perspective that the accused LPP annuity product is merely "an optional rider" to annuities. (ECF No. 85 at 2.) In Novus's view, "the LPP product is a package deal and a core part of Prudential's variable annuity business." (*Id.*) In other words, it is a "single, comprehensive product." (*Id.*) According to Novus, it is then "disingenuous when Prudential represents … that certain types of information related to the LPP rider 'does not exist.'" (*Id.* at 3 citing ECF No. 83 at 20-24.) As Novus explains it, "[o]f course it is the case that there may not be certain standalone data for the 'LPP rider' alone – LPP is a packaged variable annuity product that Prudential tracks and monitors at the rider + underlying variable annuity level." (*Id.* at 3.) Novus explains that it "is not seeking full blown discovery on Prudential's entire annuity business as a whole" but that these requests relate only to Prudential's *variable annuity* business. (ECF No. 85 at 3.) (emphasis added) According to Novus, "there are certain types of documents that contain relevant LPP data that may only be available alongside data for Prudential's variable annuities beyond the LPP alone" and "these materials are arguably *more* important if Prudential does not track certain LPP-specific metrics because reserving and profitability for Prudential's variable annuity business will show the LPP's impact on Prudential's bottom line as the LPP product was released and sales increased over the subsequent years." (*Id.*) (emphasis in original.)

Taking all of the above into account, the Court is satisfied that, contrary to Prudential's characterization, the dispute here is not directed to information relating to Prudential's annuity business as a whole. Rather, as the Court understands it, Novus is seeking the requested information only as it relates to Prudential's variable annuity business. As such, Novus's request is not limited to information regarding variable annuities where contract holders have chosen to enhance their annuity with the LPP option. Instead, Novus requests information relating to

variable annuities where contract holders have chosen rider options other than the LPP option or presumably where contract holders have chosen no rider option at all.   According to Novus, this information is relevant because it is not accurate to view LPP, the accused product, as a rider when Prudential itself considered the Prudential Premier Retirement Variable Annuity with Legacy Protection Plus as a single, comprehensive product.  Novus cites both witness testimony and certain documents as confirming that this practice is not confined to LPP but that Prudential characterizes other "riders" as inclusive of the underlying variable annuity as well.  According to Novus, this information relating to Prudential's variable annuity business as a whole will provide the necessary "context" in which the LPP can be assessed and evaluated by Novus's experts.  The Court is not persuaded.

At bottom, the dispute here appears to arise primarily from differing constructions of both the trade secret and the accused product at issue.  Novus contends that, contrary to its view as explained above, Prudential construes these concepts too narrowly and that this overly narrow construction has confined Prudential's view of relevance.  The Court disagrees.  These terms have been defined for purposes of this case based on the allegations set forth in the Amended Complaint and Prudential's understanding appears consistent with those definitions.   This is confirmed by a review of the excerpt from Judge Sargus's Opinion and Order on Prudential's motion to dismiss set forth above.  Specifically, the trade secret has been defined as "an innovative annuity product" which Novus named the Transitions Beneficiary Income Rider ("TBIR") and TBIR's marketing materials (collectively with the TBIR, the "TBIR Information").  *See Novus Grp.,* 2019 WL 4452708, at *1–2.  Further, the accused product has been defined as Prudential's Legacy Protection Plus, an optional death benefit rider to a retirement annuity.  (*Id*. at 3.)

Prudential represents that, consistent with this understanding, it has produced all relevant documents. Counsel's obligation to approach discovery cooperatively and in good faith is governed, in part, by Federal Rule of Civil Procedure 26(g). *Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *17 (S.D. Ohio July 1, 2014), *adopted as modified,* No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015). That rule provides, in relevant part, that every time an attorney signs a disclosure, discovery response, or objection, the attorney is certifying that "to the best of the [attorney's] knowledge, information, and belief **formed after a reasonable inquiry,** the statements the attorney is making are "consistent with the [ ] rules," "warranted by existing law or by a nonfrivolous argument" for extending or changing the law, "not interposed for any improper purpose," and not unduly burdensome or unreasonable. *Id.* (emphasis in original). That obligation is backed up by sanctions as provided in Rule 26(g)(3). Those sanctions can be imposed if an attorney fails in his or her "duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents." *Id.* (citing *Bernal v. All American Investment Realty, Inc.,* 479 F. Supp. 2d 1291, 1333 (S.D. Fla. 2007)).

As with the LPP reserve data for 2017-2019, the Court presumes counsel has discharged her duties here. Novus has provided no basis for concluding otherwise. Indeed, beyond its challenge to the governing definitions, much of Novus's argument relies on self-serving interpretations of select witness testimony and speculation regarding Prudential's trial strategy.

Moreover, even if the Court were to accept Novus's theory of LPP's transformation once a contract holder selects the LPP rider as an option, it is not convinced that such a transformation would support discovery addressed to the whole of Prudential's variable annuity business. At most, given that the TBIR utilizes a guaranteed death benefit and the LPP is an optional death

15

benefit rider, the only relevant context would seem to be provided by other variable annuities with optional death benefits.  Novus's requests, however, are not so limited here.

For these reasons, Novus's motion to compel is **DENIED** as to the three remaining requests.

### IV.

For the reasons stated above, Plaintiff Novus Group, LLC's motion to compel production of documents from Defendants (ECF Nos., 79, 80) is **DENIED.**  Prudential's request for sanctions, set forth in its Response, also is **DENIED.**


**IT IS SO ORDERED.**


DATED:  February 28, 2022
<br>

_/s/ Elizabeth A. Preston Deavers_____
**ELIZABETH A. PRESTON DEAVERS**
**UNITED STATES MAGISTRATE JUDGE**