UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NOVUS GROUP, LLC,

    **Plaintiffs,**

                             **Case No.: 2:19-cv-208**

    **v.**                           **JUDGE EDMUND A. SARGUS, JR.**

                             **Chief Magistrate Judge Elizabeth P. Deavers**

**PRUDENTIAL FINANCIAL INC.,** *et al.***,**

    **Defendants.**

## OPINION AND ORDER

This matter arises on Defendants'[1] ("Prudential") Motion for Summary Judgment on Plaintiff Novus Group, LLC's ("Novus") sole remaining claim for trade secret misappropriation. (ECF No. 102.) For the reasons stated herein, Prudential's motion is **GRANTED**. (*Id.*)

### I.

Sometime in 2012, Mark McCanney and Eric Seyboldt—two financial advisors with years of experience selling insurance products—had a business idea. In their view, no then-existing annuity product sufficiently addressed, among other trends, a growing demand from older individuals for a wealth transfer vehicle that could "guarantee" their descendants a steady stream of retirement income. To fill this gap, McCanney and Seyboldt began to conceptualize a contractual addendum (or "rider") that, once added to a standard annuity agreement, did just that. And over the next two years, McCanney and Seyboldt—with the assistance of various third parties—developed their concept into a product: the "Transitions Beneficiary Income Rider"

---

[1] Defendants consist of the following affiliated entities: Prudential Financial Inc.; Prudential Insurance Company of America; PRUCO Life Insurance Company of New Jersey; Prudential Annuities Inc.; Prudential Annuities Life Assurance Corporation; and Prudential Annuities Distributors, Inc.

("TBIR"). They also formed a company—Novus—to sell or license the TBIR to insurance companies (or "carriers").

By 2014, Novus had a particular carrier for the TBIR in mind: Nationwide Life Insurance Company ("Nationwide"). Thus, with some additional third-party assistance, Novus brought its concept to several Nationwide employees, including Michael Morrone, a leader of Nationwide's annuity product development wing. Ultimately, however, Morrone rebuffed Novus' pitch. Months thereafter, two members of Morrone's team—Rodney Branch and Lisa Ferris—departed for roles at Prudential. And shortly after *that*, Prudential brought to market its own annuity-based, wealth-transfer-themed product, the "Legacy Protection Plus" rider ("LPP").

Novus contends that the LPP's core mechanisms and marketing plan effectively mimic those of the TBIR. This, it asserts, is a consequence of Prudential's unlawful use of numerous TBIR-related trade secrets—secrets which, according to Novus, Branch and/or Ferris brought with them when they left Nationwide. On that basis, Novus now brings a single, state-law trade secret misappropriation claim against Prudential.

## II.

### A. Undisputed Facts

#### 1. McCanney and Seyboldt Form Novus

In 2001, Seyboldt joined Nationwide Financial Services, Inc. as a product developer focusing on individual annuities. Deposition of Eric Seyboldt ("Seyboldt Dep."), Pl.'s Ex. B, ECF No. 110-2, at 21:9-25. After several years, he became a Nationwide-sponsored financial advisor, where he would sell a variety of the company's insurance and securities products. Deposition of Mark McCanney ("McCanney Dep."), Pl.'s Ex. A, ECF No. 110-1, at 25:7-26:9, 118:18-119:25;

Affidavit of Mark McCanney ("McCanney Aff."), ECF No. 109-2, at ¶ 6; Seyboldt Dep. at 24:24-25. There, he befriended McCanney, who had the same job. McCanney Dep. at 119:13-20.

Not long after 2008, McCanney and Seyboldt began to encounter a growing client demographic: retirement-aged individuals who, in the face of a market "plagued" with low interest rates, sought new ways to maximize and "responsibly transfer their wealth to the next generation." Expert Report of Terry Long ("Long Report"), ECF No 109-1, at ¶ 37; McCanney Dep. at 115:14-121:6. Simultaneously, the two men came to recognize that the adult members of this "next generation" (*i.e.*, modern-day workers) lacked the same retirement income security as their parents and grandparents. Long Report at ¶ 37; McCanney Dep. at 115:19-116:13. And they attributed this shortfall, in the main, to a downturn in the availability of traditional retirement income vehicles, such as defined-benefit pensions or 401k profit-sharing plans. McCanney Dep. at 116:1-13.

In 2012, McCanney and Seyboldt concluded that no single financial product capably addressed these intersecting needs. *Id.* at 112:24-25. So, they set out to create one. By the end of 2013, the two had fleshed out a general concept: an annuity rider that enabled older individuals to provide non-spouse beneficiaries with a guaranteed, "pension-style" stream of retirement income. (Def.'s Ex. 2, ECF No. 102-4 at PageID #1124.) They also created an Ohio-based limited liability company—Novus—to market their final product.

### 2. Novus Approaches Michael Morrone

Sometime in 2013, McCanney and Seyboldt brought their idea to Michael Morrone—then an Associate Vice President of Business Development in Nationwide's annuity sector—to discuss a potential Novus-Nationwide partnership. McCanney Dep. at 125:5-12. Prior to this meeting, Morrone cautioned Seyboldt "that Nationwide would not sign an NDA and they should not disclose any confidential information about their design." Deposition of Michael Morrone ("Morrone Dep."), Def.'s Ex. 6, ECF No. 102-8 at 74:9-19; 76:11-13.

Throughout their hour-long consultation in Morrone's office, McCanney and Seyboldt engaged in a "high level" discussion surrounding a concept for "an income guarantee . . . that would be passed to beneficiaries." *Id*. At some point, the two brought out a "marketing piece" that was held in a rolled-up container. *Id.* Ultimately, nothing concrete resulted from the meeting, though Morrone noted he would "see if [Novus' concept] . . . fit into the direction Nationwide was going." *Id.* at 79:12-14.

### 3. Novus Partners with Annexus and Genesis

After the Morrone meeting, McCanney and Seyboldt, as Novus, sought out two companies—Genesis Financial Development Company, Inc. ("Genesis") and Annexus Management Company ("Annexus")—to help develop and/or market their annuity rider concept. Deposition of Mark McCanney ("McCanney Dep. II"), Def.'s Ex. 10, ECF No. 102-12 at 166:2-167:5. Genesis, in particular, was known for its actuarial services, specifically in relation to the pricing of new financial products. Morrone Dep. at 11:24-12:18, 53:21-22. Annexus focused on the development, distribution, and marketing of the same. Morrone Dep. at 11:24-12:18, 53:21-22.

At the time, Genesis and Annexus had established a joint venture: AnnGen Development LLC ("AnnGen"). And as Novus was at least somewhat aware, AnnGen was actively working with Nationwide to jointly develop a new, fixed indexed annuity ("FIA") product. Morrone Dep. at 13:4-7; Seyboldt Dep. at 100:2-9. Part of AnnGen and Nationwide's partnership, as Novus would later learn, entailed an agreement by the two companies not to disclose one another's "confidential" or "proprietary" information (or that of their affiliated entities) (the "AnnGen-Nationwide Agreement"). (Pl.'s Ex. 3, ECF No. 110-11.)

### a. The "Product Development" and "Marketing & Training" Agreements

In July 2013, Novus entered into a preliminary confidentiality agreement with Genesis. McCanney Dep. II at 162:17-20. By the end of February 2014, Novus entered into two more agreements (collectively, the "Agreements"): one with Annexus and Genesis (the "Product Development Agreement") (Pl.'s Ex. 1, ECF No. 110-9), and another with Annexus solely (the "Marketing and Training Agreement") (Pl.'s Ex. 2, ECF No. 110-10).

Across both Agreements, Annexus pledged to pitch Novus' "Marketing Idea"—defined as "Novus' packaging and marketing, including but not limited to the supporting sales strategy, for a Beneficiary Lifetime Income Provision"—to certain insurance companies, including Nationwide. (Pl.'s Ex. 1, ECF No. 110-9 at PageID #2896); (Pl.'s Ex. 2, ECF No. 110-10 at PageID #2902.) Genesis, for its part, vowed to "use its intellectual property to design a new annuity product or modify an existing annuity product"—defined as the "Initiative Annuity"—that would be "issued and underwritten by one of more Carriers and . . . marketed in connection with the Marketing Idea." (Pl.'s Ex. 1, ECF No. 110-9 at PageID #2896.) Throughout these endeavors, all three parties vowed not to publicly disclose any of the "Confidential Information" they exchanged with one another, including "any and all . . . information relating to a Party or its affiliates and licensors that

5

is unique, secret, proprietary or not generally known to the public." (*Id.* at PageID #2898); (Pl.'s Ex. 2, ECF No. 110-10.)

### 4. Novus and Annexus Approach Nationwide

Sometime around March 2014, Nationwide employee Ramona Neal reached out to McCanney with a stated interest in the "Annexus/Novus project."[2] (*See* Def.'s Ex. 33, ECF No. 102-35.) To McCanney, this represented "a possible opportunity" for someone at Nationwide "to begin sharing some high-level conceptual information, internally, within the product group." (*Id.*) Thus, on March 18, 2014, McCanney emailed two Annexus executives—Eric Denham and Don Dady—to ask whether they thought Neal should be "[brought] into the loop." (*Id.*) Denham, in response, solely remarked that he and Dady had an impending call with Morrone. (*Id.*) Once that occurred, he promised to contact McCanney and Seyboldt with "feedback on next steps." (*Id.*)

On March 20, 2014, Morrone, Denham, and Dady had their discussion. Morrone Dep. at 81:5-12. Therein, Morrone explicitly conveyed to Denham and Dady that Nationwide had no interest in carrying their annuity rider concept. *Id.*

### 5. Genesis Provides Novus its Actuarial Analysis

By April 2014, the "Annexus/Novus Project" had a name: the "Transitions Estate Rider," or "TER." (Pl.'s Ex. A, ECF No. 21-1.) That month, Genesis sent Novus a "preliminary pricing analysis" of the TER (the "Genesis Memo" or "Memo"), which noted Genesis' belief that it "may not be possible" to create Novus' proposed contract structure using a guaranteed lifetime

---

[2] Neal's role at the time is somewhat unsettled. In his email to Annexus, McCanney refers to Neal as "a director in the product development." (Def.'s Ex. 33, ECF No. 102-35.) But multiple Nationwide employees—namely, Michael Morrone and Lisa Ferris—suggest she worked in much different capacity within Nationwide's life insurance unit. Morrone Dep. at 70:19-20; Deposition of Lisa Ferris, ECF No. 102-9 at 37:17-18.

withdrawal benefit ("GLWB") rider (*Id.*) And as it had done once before, Genesis "proposed to design TER as a GMDB rider." (*Id.* at PageID #95.)

Despite its desire to reframe the TER as a GMDB, Genesis believed that insurance agents would, "in practice," only feel incentivized "to sell TER if it performs better than a GLWB rider." (*Id.*) Thus, to determine whether the TER was commercially feasible, Genesis opted to assess whether "a 'typical' carrier could afford to offer higher income rates under TER than under a GLWB rider." (*Id.* at PageID #96.) Ultimately, Genesis found that it could. (*Id.* at PageID #97.)

### 6. Novus Finalizes the TBIR's Design and Associated Marketing Scheme

After it received the Genesis Memo, Novus relabeled the TER as the "TBIR." It also finalized the rider's essential design, which consisted of (1) a fully compatible[3] GMDB rider that (2) solely grew at a competitive "roll-up" rate during (3) the life of a single, natural person contract owner (*e.g.*, a retiree) who (4) could not access the accumulated benefit "to fund guaranteed lifetime withdrawals." Long Report at ¶¶ 45-49. Said owner was also given the option to select (5) a non-spouse beneficiary (*e.g.*, a child or grandchild) who, upon the owner's death, could (6) be paid out through a "predetermined, life-expectancy based" number of installments. *Id.* at ¶ 52.

As Novus explained in various carrier-oriented "marketing materials," the TBIR, when coupled with Novus' "positive" branding strategy, offered retirees the unique ability to "protect," "grow," and "control" the financial "legacy" they intended to leave behind. *Id.* at ¶¶ 51-57; (Pl.'s Ex. 19, ECF No. 110-27); (Pl.'s Ex. 25, ECF No. 110-33.) And for a variety of reasons, the materials asserted, carriers and financial advisors alike stood to benefit from providing such an arrangement. *Id.* at ¶¶ 45-61; (Pl.'s Ex. 19, ECF No. 110-27); (Pl.'s Ex. 25, ECF No. 110-33.)

---

[3] That is, the rider could be used to modify "qualified . . . and non-qualified annuity contracts." (ECF No. 21 at ¶ 20.)

### 7.  Novus Reapproaches Nationwide

On May 30, 2014, Seyboldt notified Denham that Chuck Bremer—a Nationwide actuary—had, like Neal, expressed an interest in Novus' annuity concept. (Pl.'s Ex. 4, ECF No. 110-12 at PageID #2920.) According to Seyboldt, Bremer sought "more information regarding the tax implications and pricing of the rider," and thought "it would make sense for [Novus/Annexus] to eventually pitch the business case to the [Nationwide] Leadership Group." (*Id.*) He also acknowledged that Morrone would be the "gatekeeper" of any prospective Novus-Nationwide partnership.  (*Id.*)

On the morning of June 2, 2014, Denham responded. (Pl.'s Ex. 4, ECF No. 110-12 at PageID #2919.) He noted that he had spoken to Morrone, who had "reiterated his position" that the TER likely "would [not] make it up the [Nationwide] priority list." (*Id.*); *see* Morrone Dep. at 98:12-18. At the same time, Denham added, Morrone remained "open to the dialogue." (Pl.'s Ex. 4, ECF No. 110-12 at PageID #2919.) So, he gave McCanney and Seyboldt the go-ahead to contact him. (*Id.*) In the interim, Denham vowed to send Morrone a copy of the Genesis Memo himself. (Pl.'s Ex. 4, ECF No. 110-12 at PageID #2919.) Within the hour, he followed up on his word. (*Id.*); Morrone Dep. at 120:9-12.

#### a.  Bremer Emails Nate Wilbanks

That same day, Bremer confirmed with McCanney and Seyboldt that he was "not the appropriate [Nationwide] contact" for their inquiry. (Pl.'s Ex. 7, ECF No. 110-15 at PageID #2940.) Instead, Bremer noted, they "would need to work through" Nate Wilbanks—another Nationwide actuary—and Morrone. (*Id.*) Later that day, Bremer sent Wilbanks an email which (1) summarized Novus' concept and relationship with Annexus/Genesis and (2) offered to provide

Wilbanks "any of the [Novus] information" then in his possession, which included the Genesis Memo. (*Id.*) Copied to the message were McCanney, Seyboldt, and Morrone. (*Id.*)

The next morning, Seyboldt reached out to Wilbanks and Morrone. (*Id.* at PageID #2939.) After summarizing the TER concept and its "first of its kind, built-in, marketing system," Seyboldt inquired whether the two men had any availability to meet. (*Id.*) Ultimately, no meeting occurred. Morrone Dep. at 123:15-23.

### 8. Rodney Branch and Lisa Ferris Depart Nationwide for Prudential

As Novus and Annexus pitched the TBIR to Morrone throughout 2014, he directly reported to Rodney Branch, who was then the Vice President of Nationwide's annuities wing. Deposition of Rodney Branch ("Branch Dep."), Def.'s Ex. 14, ECF No. 102-16 at 27:12-21. At the same time, Lisa Ferris—a business development director who led the "strategy of a subset of [Nationwide's] annuities business"—reported to Morrone. Deposition of Lisa Ferris ("Ferris Dep."), Def.'s Ex. 7, ECF No. 102-9 at 22:14-24.

In June 2015, Branch left Nationwide to become the Chief Marketing Officer of Prudential's annuities department. Branch Dep. at 25:10-13, 27:12-21. Several months later, Prudential folded its annuities product development team into Branch's wing. *Id.* at 111:14-114:3. It also vested Branch with an additional title: "Head of Product." *Id.*; Ferris Dep. at 61:8-18. At that point, Branch found himself responsible for guiding the strategy of Prudential's annuity product development—"a pretty big business within Prudential"—while also "solv[ing]" issues on the "marketing side[.]" *Id.* at 111:19-112:11.

Branch understood that his new responsibilities would be tough to juggle without restructuring his supporting cast. *Id.* at 112:5-11. That meant he needed more "talent" (and "quickly") to keep things running smoothly. *Id.* at 120:20-24. Thus, in February 2016, Branch

9

began to recruit Ferris to join Prudential to work as a "liaison" between the two divisions he then led. Ferris Dep. at 62:2-63:17; Branch Dep. at 122:1-21. And by June 2016, she did. Ferris Dep. at 63:2.

### 9. Prudential Launches the LPP

#### a. Development

Sometime in August 2016, Branch's product development team—then led by Mike Guido and Jason Uberti—"set [its] sights" on developing Prudential's first FIA product. Branch Dep. at 156:14. To flesh out a concept, it hosted several group sessions involving members of various cross-functional departments (*e.g.*, marketing and sales), some of which Ferris attended. Ferris Dep. 115:16-18. Soon thereafter, however, the Branch's team dropped the FIA idea altogether. Branch Dep. at 148:8-17; Deposition of Ray Sbrega, Def.'s Ex. 12, ECF No. 102-14 at 77:5-9. This, by necessity, required it to come up with a new project. Branch Dep. at 148:8-17, 152:4-6. Ultimately, after kicking around various ideas, Branch's team fixated itself on, and eventually chose to develop, an "enhanced," stand-alone death benefit rider that would be compatible with Prudential's existing variable annuity products.[4] *Id.*; Sbrega Dep. at 24:14-19.

Between August and September 2016, Branch's team conducted a multi-day "scrum session" to work out a baseline design for its annuity rider concept.[5] Branch Dep. at 148:8-17, 157:4-6; Ferris Dep. at 124:1-4. At some point therein, the group settled on imbuing the rider with

---

[4] Branch, while ultimately unsure, "think[s] it was [Guido]" who first mentioned the idea to pursue a death benefit product during a brainstorming meeting. Branch Dep. at 146:16-19, 148:14-17.

[5] Attendees of the full "scrum session" included Uberti, Guido, Ray Sbrega (who, as a product development director, reported to Uberti), and a number of Prudential sales, pricing, and marketing employees. Branch Dep. at 146:19-24; Sbrega Dep. at 36:4-18, 67:21-68:5. Branch, as the head of the product team, "kicked off" the session's initial meeting with some general strategic remarks, but left the room thereafter. Branch Dep. at 146:22-24; Sbrega Dep. at 68:18-69:13. He did not return. Sbrega Dep. at 68:18-69:13. Ferris, while invited, did not attend the session. Ferris Dep. at 122:8-9, 123:18-19. She did, however, help several members of Branch's product development team prepare for the session—namely, by "peer reviewing" their list of design options. Sbrega Dep. at 72:9-18.

a "roll-up" feature. Sbrega Dep. 78:4-14. It also discussed other structural elements—*e.g.*, the use of a higher-than-normal "roll-up" rate, or a feature that prevented the contract owner from accessing the benefit to fund lifetime withdrawals—that could distinguish the final product from the rest of the market. (*See* Def.'s Ex. 17, ECF No. 102-19.)

By October 2016, Branch's team had a better (albeit unsettled) picture of its rider concept's design. (*Id.*) At that point, Uberti left his job at Prudential. Ferris Dep. at 95:4-5. To fill the void, Branch reassigned Ferris—who, at the time, operated on the marketing side of his department— as the interim leader of his department's "product strategy team." *Id.* at 95:4-96:8; 104:8-9. This rendered her responsible for the "finalization . . . [internal] approval . . . and market launch" of the team's yet-to-be-titled death benefit concept. *Id.* at 95:4-96:8, 126:11-22. It also made her a primary point of contact for the marketing team that, ultimately, would pitch the finished product to "outside financial advisors." Ferris Dep. at 146:2-157:24, 161:19-22, 185:15-18.

### b. Finalization and Launch

By February 2017, Branch's department locked in both the design of, and marketing strategy for, its death benefit concept—which, at that point, was titled "the LPP." Sbrega Dep. at 112:22-113:12; (Pl.'s Ex. 26, ECF No. 110-34 at PageID #3567-77.) On the design side, the LPP— like the TBIR—offered (1) a fully compatible GMDB which (2) solely grew at a predetermined, simple-interest roll-up rate that (3) accrued over the life of a single, natural-person owner who (4) could not access the benefit to "fund guaranteed lifetime withdrawals." Sbrega Dep. at 21:16-22:7. So too did it (5) allow the contract owner to select a non-spouse a beneficiary, who, at the owner's selection, could (6) receive a predetermined, lifetime-based payout. *Id.* Simultaneously, Branch's department developed, among other things, promotional materials which emphasized the LPP's

ability to help older individuals "protect," "grow," "control," and "efficiently pass[]" their "legacy" to their descendants. (Pl.'s Ex. 26, ECF No. 110-34 at PageID #3567-77, 3587-98.)

In May 2017, Prudential officially brought the LPP to market. Branch Dep. at 12:12-16.

## B. The (Alleged) 2015 McCanney-Ferris Meeting

Sometime in 2015, McCanney alleges he gave a one-hour, solo presentation regarding the TBIR to various Nationwide employees, including Lisa Ferris. (Def.'s Ex. 3, ECF No. 102-5 at PageID #1142.) Therein, McCanney allegedly shared four hardcopy, TBIR-related documents, which consisted of: (1) a TBIR "FAQ," (2) the Genesis Memo, (3) a TBIR "Feasibility Study," and (4) a wealth-transfer oriented "case study." McCanney Dep. at 175:6-177:7. Ferris, according to McCanney, took notes and asked questions. *Id.* at 185:9-186:4. McCanney does not remember whether Ferris took any documents with her. *Id* at 185:5-7.

Ferris, for her part, essentially denies that any such meeting occurred. *See* Ferris Dep. at 26:22-27:2, 43:21-53:22 (denying any awareness "of the Novus product or the TBIR" or "involve[ment] in the review of product ideas brought to Nationwide's attention by Annexus" while at Nationwide). And for various reasons, Prudential argues that this Court should essentially ignore McCanney's story.[6]

## C. Novus' Trade Secret Misappropriation Claim

By creating and marketing the LPP, Novus contends Prudential "willfully and maliciously misappropriated" its trade secrets, which it identifies as: (1) "[t]he combined features of the TBIR,"

---

[6] Prudential characterizes McCanney's allegation—which came two years after Novus initially averred in discovery that it "[did] not know what documents or other information was provided to Lisa Ferris or Rodney Branch Concerning the TBIR or any Trade Secret in the course and scope of their employment with Nationwide"—as an "eleventh-hour attempt to manufacture evidence about Novus' direct disclosure" of TBIR-related information to Ferris. (Def.'s Mot., ECF No. 102-1 at PageID #1079-82.) And it argues that various doctrines of judicial estoppel warrant striking it from this Court's analysis altogether. (*Id.*) The Court, however, need not wade into that issue, as it finds summary judgment appropriate regardless.

(2) "[t]he marketing strategy to promote the sale of the TBIR, which . . . was addressed to both financial planners and their clients,"[7] and (3) "[t]he combination of the TBIR design and the accompanying marketing strategy described above," all in violation of the Ohio Uniform Trade Secrets Act (the "Act"), Ohio Rev. Code. ("O.R.C.") §§ 1333.61, *et seq.* According to Novus, all of this information reached Prudential's doors by way of Rodney Branch and/or Lisa Ferris, whom it alleges received several confidential, TBIR-related documents through various channels while at Nationwide.

Prudential rejects virtually every premise of Novus' misappropriation claim. It argues, as an initial matter, that Novus has failed to establish that the TBIR and its associated "marketing strategy" even *were* protectable trade secrets. And even assuming Branch or Ferris were apprised of those secrets—which both individuals flatly deny—Prudential asserts there is simply no evidence either person "misappropriated" them. On these grounds, among others, Prudential asserts it is entitled to summary judgment as a matter of law.

For at least two reasons, the Court agrees.

## III.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[7] By this, Novus generally refers to a marketing plan which presented the TBIR as a revolutionary "wealth transfer" vehicle—one that enabled older individuals to "control" the "legacy" they left their children or grandchildren. (Pl's Resp., ECF No. 109 at PageID #2671.) This plan, according to Novus, also contained a "unique strategy" of using "positive" language that would ease prospective customers into the wealth-transfer discussion "without disparaging" their intended beneficiaries. (*Id.* at PageID #2672.)

13

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). To prevail in that endeavor, the non-movant must clearly identify "with enough specificity" the parts of the record that enable the court to "readily identify the facts upon which the non-moving party relies." *Siemer v. Comet N. Am.*, 467 F. Supp. 2d 781, 785 (S.D. Ohio 2006) (quoting *Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 405 (6th Cir. 1992). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

14

**IV.**

## A. The Ohio Uniform Trade Secret Act

To prevail on an Ohio Uniform Trade Secret Act claim, a plaintiff must establish: (1) the existence of a trade secret; (2) the acquisition of the trade secret as a result of a confidential relationship; and (3) the unauthorized use of that trade secret. *See, e.g.*, *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citation omitted). Under the Act, a "trade secret" constitutes any

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> > (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1336.61(D). Channeling the Restatement (First) of Torts § 757, the Ohio Supreme Court has set forth six distinct factors that "should be considered" in the standard trade secret analysis, which include:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524–25, 687 N.E.2d 661, 672 (1997).

15

"In analyzing whether information is disclosed within a confidential relationship, Ohio courts have generally considered the facts of each case, looking for an agreement or understanding of confidentiality." *SKF USA Inc. v. Zarwasch-Weiss*, No. 1:10-cv-1548, 2011 WL 13362617, at *16 (N.D. Ohio Feb. 3, 2011) (quoting *R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App. 3d 789, 805, 637 N.E.2d 332, 341 (Ohio App. Ct. 1993)).

## B. Analysis

### 1. "Independent Economic Value"

Prudential argues, on numerous grounds, that there is no "genuine dispute" the TBIR and its associated marketing strategy fall outside the ambit of a "trade secret" insofar as the term is defined by Ohio law. Among its numerous arguments is a simple point: that neither the TBIR nor its consumer-facing "marketing strategy" constituted information that "derive[d] independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from [their] disclosure or use." (Def.'s Mot., ECF No. 102-1 at PageID #1087-89.) This is so, Prudential asserts, given the fact both pieces of information needed to be fully exposed to the public—and thus made instantly replicable—for Novus to derive any "economic benefit" from their use. (*Id.*)

Novus does not dispute that its alleged trade secrets, once marketed to the public, would be easily replicable. (Def.'s Ex. 3, ECF No. 102-5 at PageID #1140.) But that, it argues, does not mean they bore no "independent economic value" *before* that point. (*Id.*) As Novus' expert witness Terry Long notes, Novus maintained an obvious "economic" advantage by keeping the TBIR a secret: the exclusive ability to "shop" a first-of-its-kind wealth transfer solution to insurance carriers. Long Report at ¶ 96; (*see* Pl.'s Resp., ECF No. at 109 at PageID #2698-70.)

16

As Prudential sees it, the "independent economic value" Novus ascribes to its alleged trade secrets does not comport with Ohio's definition of the term. And it cites, among other cases, *Stromback v. New Line Cinema*, 384 F.3d 283 (6th Cir. 2004) to support its view. There, the United States Court of Appeals for the Sixth Circuit rejected an "aspiring screenwriter['s]" claim that his poem and screenplay qualified as "trade secrets" under Michigan law (which employs the same "trade secret" definition as Ohio) "because he kept [those works] secret." *Stromback*, 384 F.3d at 305. This was so despite the conceivable possibility that either work could be licensed or sold. *See id.* As the court explicitly noted, "the essence of a trade secret is that it derives value from its secrecy." *Id.* And neither a screenplay nor poem, it determined, could "possibly" satisfy this threshold, given that both works only generated "independent economic value" when their full contents were "exploited publicly through broad dissemination." *Id.* (internal quotation marks omitted).

"In essence, the [*Stromback*] court held that a product cannot constitute a trade secret when it provides its creator with economic value *only when* disseminated [or sold] to third parties." *Mainardi v. Prudential Ins. Co. of Am.*, No. 08-3605, 2009 WL 229757, at *8 (E.D. Pa. Jan. 30, 2009) (emphasis added). Prudential argues—and the Court is persuaded—that this principle applies here. By all accounts, Novus' only possible method of obtaining an "economic" benefit from the TBIR and its associated "marketing strategy" was (and is) selling or "assigning" either concept to a "carrier" (*e.g.*, Nationwide) to "exploit[] publicly." (*See* Def.'s Ex. 3, ECF No. 102-5 at PageID #1139.) And again, there is no dispute that, once this occurred, either concept would become almost instantly replicable. Deposition of Terry Long, Def.'s Ex. 5, ECF No. 102-7 at

240:20-241:8. Such would disqualify either concept as a "trade secret" under *Stromback*. 384 F.3d at 305; *see Mainardi*, 2009 WL 229757, at *8-9.[8]

To be sure, *Stromback*—as an interpretation of Michigan law—is not controlling. And it is clear enough that courts in other circuits have taken a different view. *See, e.g., Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 729 (7th Cir. 2003) ("The fact that a secret is easy to duplicate after it becomes known does not militate against its being a trade secret prior to that time.") (citation omitted). Regardless, this Court finds the Sixth Circuit's guidance in *Stromback* "probative" of the proper way to interpret the Ohio Uniform Trade Secrets Act's "independent economic value" provision. *See Niemi v. NHK Spring Co., LTD.*, 543 F.3d 294 (6th Cir. 2008) (applying Illinois caselaw to an Ohio trade secret dispute because (1) "both the Illinois and Ohio versions of the Uniform Trade Secrets Act include the same definition of 'trade secret'" and (2) the Ohio Uniform Trade Secrets Act specifically dictates that its provisions "shall be applied and construed to effectuate their general purpose and to make uniform the law with respect to their subject"); *Mainardi*, 2009 WL 229757 at *9 (applying *Stromback* to an interpretation of the Pennsylania Uniform Trade Secret Act's "trade secret" definition because Michigan's trade secret statute "contains identical language").

Novus does not offer any persuasive reason to do otherwise. Instead, it points to three cases to substantiate the notion that "sales and marketing strategies and other business information can constitute 'trade secrets'" under Ohio law, "so long as the [Act's] other elements are satisfied. (Pl.'s Resp., ECF No. 109 at PageID #2698) (collecting cases). And as a general proposition, that

---

[8]Akin to the *Mainardi* plaintiff, here Novus "actively market[ed]" the TBIR to several employees of a potential customer (*i.e.*, Nationwide). 2009 WL 229757, at *9. And unlike the *Mainardi* plaintiff (and as discussed *infra*), Novus did not itself have any confidentiality agreement with that customer. *Id.* (noting that "because Plaintiffs were actively marketing their products, the products were 'readily ascertainable' by proper means by[ ] other persons who [could] obtain economic value from [their] disclosure or use'").

is true. But as Prudential correctly observes, all of the cases Novus offers to support its contention

either do not apply to, or neglect to fully address, the specific type of information at issue—that

is, a product concept and "positive" marketing plan which, by design, must be fully "exposed for

the world to see and for competitors to legally imitate" in order to confer an "economic benefit"

to their holder.[9] *Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976).

Thus, the Court will defer to the Sixth Circuit's interpretation in *Stromback*. To that extent,

it finds that Novus' TBIR-related trade secrets lacked the type of "independent economic value"

necessary for them to obtain "trade secret" status. And even if they did possess such value, Novus'

misappropriation claim, as explained below, still fails as a matter of law.

## 2. "Confidential Relationship"

To prevail on its claim, Novus must prove that Prudential "misappropriated" its trade

secrets. *See* O.R.C. § 1333.61(A)-(B).[10] As alleged, Novus' theory of misappropriation stems

---

[9] Novus cites to only one case decided by an Ohio court: *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 273, 747 N.E.2d 268 (1st Dist. 2000). But the "marketing" information there, as opposed to Novus' "marketing strategy"—which essentially constituted a playbook for the TBIR's public branding—had a much different character. *See id.* (holding that the plaintiff's "analysis and interpretation" of "raw data that [it]received from [a] marketing firm" constituted a trade secret because, among other things, it facilitated the plaintiff's internal strategy for marketing certain products). The other two cases that Novus cites—*Kuvedina, LLC v. Conizant Tech. Solutions*, 946 F. Supp. 2d 749, 755-56 (S.D. Ohio 2013) and *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000)— did not fully address the merits of the "marketing"-related information at issue. *See Kuvedina,* 946 F. Supp. 2d at 755-56 (denying defendant's motion to dismiss because it failed to "attack the factual basis" of the plaintiff's complaint); *Kitsonas*, 118 F. Supp. 2d at 854 (granting an employer's motion to preliminarily enjoin an ex-employee from disclosing, among other things, his ex-employer's internal "business philosophy and sales strategies," but focusing on the defendant's possession of "cost and price files," "sales volume information," and "customer" lists).

[10] As defined by the Ohio Uniform Trade Secrets Act, a trade secret is "misappropriated" when it is:

1. Acqui[red] . . . by a person who knows or has reason to know the trade secret was acquired by improper means; or

2. Disclos[ed] or use[d] without the express or implied consent . . . by a person who did any of the following:

   a. Used improper means to acquire knowledge of the trade secret;

   b. At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

19

entirely from its contention that Ferris and/or Branch violated their "duty to maintain [the] secrecy" of Novus' TBIR-related information by using it to develop the LPP. (First Amended Complaint ("FAC"), ECF No. 21 at ¶¶ 44-46, 51); (Pl.'s Resp., ECF No. 109 at PageID #2705) (noting that the "question is . . . whether a confidential relationship existed directly between Novus and Prudential employees Mr. Branch and Ms. Ferris").

Initially, Novus alleged that Ferris and Branch's duty of confidentiality arose from either (1) a non-disclosure agreement signed by Annexus and Nationwide or (2) Ferris and Branch's "own confidentiality agreements with Nationwide." (FAC, ECF No. 21 at ¶¶ 34, 44.) But Novus, simply put, has not substantiated the existence of either.[11] Nowhere does it point this Court to any Nationwide-related confidentiality agreement specific to Branch or Ferris. Nor, crucially, does Novus offer any evidence that Branch, Ferris, or Nationwide assured it—verbally or in writing— that they would guard its proprietary information.[12]

The AnnGen-Nationwide Agreement does not change the equation. As Prudential correctly observes, that agreement, which was signed in 2012, is cabined to AnnGen, Nationwide, and their affiliated entities. (*See* Pl.'s Ex. 3, ECF No. 110-11 at PageID #2912-14); (Def.'s Mot., ECF No.

---

        c.    Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.R.C. § 1333.61(B). The Act further defines "improper means" to include: "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1333.61(A).

[11] In its Response in Opposition to Prudential's Motion for Summary Judgment, Novus solely focuses its confidentiality-based arguments on whether or not it took "reasonable efforts" to protect its alleged trade secrets. (Pl.'s Resp., ECF No. 109 at PageID #2697.) That might suffice if the *only* inquiry here was whether or not a trade secret existed. *See* O.R.C. § 1331.61(D)(2). But it is not. Novus must still present evidence that its alleged trade secrets were "misappropriated" in a manner prescribed by O.R.C. § 1333.61. *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 878, 897 (2009 N.D. Ohio), *aff'd*, 606 F.3d 262 (6th Cir. 2010). It has not.

[12] Indeed, Novus expressly or tacitly concedes that: (1) it never provided Branch with any TBIR-related information; (2) Ferris did not sign any confidentiality agreement before McCanney allegedly disclosed Novus' trade secrets to her in 2015; and (3) it was explicitly warned in 2013 "not [to] disclose any confidential information about [the TBIR's] design" because "Nationwide would not sign an NDA." *See* McCanney Dep. at 181:17-184:16; Morrone Dep. at 74:9-19; Seyboldt Dep. at 100:4-9.

102-1 at PageID #1087); Morrone Dep. at 57: 19-59:8 (stating that the AnnGen-Nationwide Agreement was "very narrow in scope and . . . specific to the Nationwide New Heights [FIA] product that Annexus and Genesis brought to [Nationwide]"). It does not, on its face, bind Nationwide (or its employees) to Novus in any material respect.[13] Nor is there any indication that Branch, Ferris, or any other high-level Nationwide employee (such as Morrone) thought differently. *See* Branch Dep. at 82:1-2; Ferris Dep. at 43:21-23; Morrone Dep. at 57:19-23.

Of course, a duty to keep certain information confidential may in some instances arise implicitly. *See R & R Plastics, Inc.* 92 Ohio App. 3d at 805, 637 N.E.2d 332 (granting summary judgment based in part on the plaintiff's failure to present evidence of "an express or implied agreement of confidentiality between the parties"). Novus appears to suggest that happened here. (Pl.'s Resp., ECF No. 109 at PageID #2664-65, 2697.) It notes, specifically, that: (1) it was "aware" Annexus and Genesis were parties to the AnnGen-Nationwide Agreement; (2) various Annexus employees had assured it that "they had the proper agreements in place for [Novus] to freely discuss [the TBIR]" with Nationwide; and (3) based on this information, it had a "reasonable belief" that any TBIR-related information it shared with Nationwide would remain confidential. (*Id.*)

But the mere fact Annexus—a third party—left Novus with the belief that the proprietary information it shared with Nationwide would remain confidential says next to nothing about *Nationwide's* thoughts on the matter, let alone those of Branch or Ferris. Novus cannot fashion a

---

[13] In his deposition, McCanney suggested that another basis for Novus' belief that Nationwide would keep its information confidential was that "there was more than one [confidentiality] agreement" between Nationwide and Annexus. *See* McCanney Dep. at 160:24-25; Morrone Dep. at 59:9 (noting that it was his "understanding" that Nationwide and Annexus had "entered into other mutual confidentiality and nondisclosure agreements related to different products that Annexus was presenting to Nationwide"). Novus, however, does not elaborate as to when those agreements were signed or what they entailed in its Response in Opposition to Prudential's Motion for Summary Judgment. (*See* Pl's Resp., ECF No. 109.)

bilateral "agreement or understanding of confidentiality" between it and Nationwide from a unilateral impression that such an "agreement or understanding" existed. *See Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 262 (S.D.N.Y. 2014) (noting that the plaintiff's "belief in the confidentiality of its information, however fervent, does not transform that information into trade secrets"). *Some* affirmative evidence of an assurance of secrecy from Nationwide is needed. *See Niemi*, 543 F.3d at 302-03 (finding that the plaintiff's bare, uncontroverted averment that he received an "assurance of confidentiality" from the defendant was enough to create a genuine issue of material fact as to whether the plaintiff used "reasonable efforts" to protect his trade secret); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 897 (N.D. Ohio 2009) *aff'd*, 606 F.3d 262 (holding that the defendant could not have "misappropriated" the plaintiff's trade secret by obtaining it from a third party because that third party "was under no contractual duty" to maintain the secrecy of the plaintiff's information); *R & R Plastics, Inc.* at 341. And here, Novus effectively offers none.

## V.

Novus, in sum, has not established that the TBIR's design and associated "marketing strategy" derived the type of "independent economic value" contemplated by Ohio law when they were allegedly misappropriated. *See* O.R.C. § 1333.61(D). Nor has it shown with "specific facts" that Branch and/or Ferris had any "duty" to keep that information secret when they joined Prudential. *See* O.R.C. § 1333.61(A)-(B); *Anderson*, 477 U.S. at 250. Both of these shortcomings are fatal to its misappropriation claim. Thus, the Court **GRANTS** Prudential's Motion for Summary Judgment. (ECF No. 102.)

This case shall be closed on the docket of this Court.

**IT IS SO ORDERED.**

<u>**August 1, 2022**</u>                                    <u>**/s/ Edmund A. Sargus, Jr.**</u>
**DATE**                                              **EDMUND A. SARGUS, JR.**
                                                     **UNITED STATES DISTRICT JUDGE**